KURT S. ODENWALD, Presiding Judge
Introduction
Elaine M. Taylor ("Wife") appeals from the trial court's judgment dissolving her *646 marriage to Michael R. Taylor ("Husband"), dividing the parties' marital property, and awarding maintenance and child support. On appeal, Wife contends that the trial court erred in awarding non-modifiable maintenance in the amount of $2500 limited to thirty-six months, quashing her motion for a subpoena duces tecum on Husband's employer, and not dismissing Husband's claim for tortious interference with a business expectancy. Because the record lacks substantial evidence to support the trial court's maintenance award, the trial court erred in setting limitations on the amount, duration, and modifiability of the award. However, the trial court did not abuse its discretion in limiting Wife's discovery given its over breadth and intrusion into confidential and proprietary business matters. Lastly, the trial court erred in not dismissing Husband's counterclaim for tortious interference as the trial court found Husband suffered no damages, a required element of his claim. Accordingly, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.
Factual and Procedural History
The facts relevant to this appeal are as follows: Husband and Wife married in 1996 and had two children, aged thirteen and seventeen at the time of trial. The family resided at 60 Tahoma Drive in Foristell, Missouri ("Tahoma Drive Property"). In November 2015, Husband relocated to New York City for work without Wife. The parties separated later that month, and Husband filed for divorce in March 2016.
Wife is a licensed attorney. Wife has not worked full-time for a law firm since 1993 and has been the primary caretaker of the two children. Wife received her law degree from Washington University in 1992, During trial, Husband called a vocational rehabilitation expert, Tim Kaver ("Kaver"), who interviewed Wife and prepared a report. Kaver testified that Wife is an experienced attorney who has worked part-time as a sole practitioner since 1995 in family, traffic, and bankruptcy law. Kaver further testified that Wife's last full-time employment was in 1993, when she worked as a tax department attorney for one year at a law firm earning between $30,000 and $40,000. In 2013, Wife's earnings were a net loss of - $4,622. In 2014, Wife earned an income of $204. Wife had no reported income for 2015 or 2016.
Kaver testified that he conducts job placement for approximately one attorney each year and that one percent of his firm's work involves placement for attorneys, Kaver concluded that Wife could most likely obtain a position within two to six months with a small- to mid-sized law firm earning between $70,785 and $107,910 annually. Kaver based his conclusions on labor market statistics provided by Robert Half Legal. Kaver did not interview Wife regarding her professional networking capability.
Wife testified that her monthly expenses were $38,518.50 per month, $12,650 of which went towards the care of six riding horses at the Tahoma Drive Property. The parties' daughter was engaged in equestrian training and competitions during the marriage. At trial, Wife sought maintenance of $6000 per month. Wife testified that with such maintenance she would be able to supplement her income to help meet her reasonable needs after the sale of the Tahoma Drive Property. The trial court imputed no income to Wife when calculating child support on its Form 14.
The Tahoma Drive Property is fourteen acres with a residence, barn, and animals, including the six riding horses. The trial court found the expense of maintaining the property, with the associated equestrian *647 costs, exceeded $30,000 per month. The trial court ordered the Tahoma Drive Property be sold as soon as practicable. The net proceeds, if any, were to be divided sixty percent to Wife and forty percent to Husband, following satisfaction of the parties' 2016 tax debt. Until the parties sell the Tahoma Drive Property, the trial court ordered Husband to pay the mortgages and utilities and delegated responsibility for maintaining the animals and the grounds to Wife.
The trial court awarded Wife non-modifiable maintenance of $2500 per month, terminable upon the earliest of the following events: the death of either party, the remarriage of Wife, or Husband's payment of monthly maintenance for thirty-six months. The trial court found that "[t]he vocational expert at trial testified that [Wife] could be employed in six months earning from $70,000 to over $100,000. Therefore, the Court finds that there is considerable and substantial evidence presented at trial that [Wife] will be self-supporting in less than the three-year term of maintenance."
Among other distributions of marital property relevant to this appeal, the parties' joint tax liability was ordered to be paid sixty percent by Husband and forty percent by Wife. The trial court also valued and distributed various IRA accounts and stocks as well as Husband's pension plan, most of which were divided equally between the parties. The distribution of the parties' assets is not challenged in this appeal. On its Form 14, the trial court imputed to Husband a monthly gross income of $42,215.00.
Wife testified at trial that she believed Husband began an affair with Margaret Gill ("Gill"), whom he met through work, in September 2015. Husband is employed at Anheuser-Busch InBev Worldwide Inc. ("A-B") as the Vice-President of Mergers and Acquisitions. Husband testified that he first met Gill in August 2015 in the course of his employment acquiring small breweries for A-B. Gill co-owned a brewery in California that intended to sell its interest to A-B. Husband stated that he only met Gill on three occasions before deciding to divorce Wife and that he did not pursue a romantic relationship with Gill until late November 2015. During cross-examination, Husband admitted that while still married to Wife, he and Gill conducted multiple telephone conversations, sometimes late at night, lasting over one hour. Husband also admitted he told Gill that he loved her in March 2016. In May 2016, Husband took a trip with Gill to pursue a business opportunity. Husband testified that he had a vasectomy reversal in September 2016 during the time he was dating Gill, and Gill drove Husband home after the procedure.
Wife testified that she came to believe Husband and Gill were having an affair in February 2016. Wife served a subpoena duces tecum on A-B in May 2016. In the subpoena, Wife requested, among other things, all email correspondence between Husband and Gill from January 1, 2014 to the time of trial. Covering the same timeframe, Wife further requested Gill's corporate credit cards, all of Gill's employer-reimbursed expenses, and Gill's flight itineraries and travel schedules. After the parties thoroughly briefed the discovery issues, the trial court granted A-B's motion to quash the subpoena.
Husband amended his action for dissolution of marriage to include a claim for tortious interference with a business expectancy. Specifically, Husband alleged that Wife interfered with his employment at A-B, which compromised Husband's employment, career, and business expectancy with A-B. Despite finding that Husband was not damaged as a result of Wife's *648 actions, the trial court did not dismiss the tortious interference claim.
The trial court entered its judgment dissolving the marriage and providing for child custody, child support, spousal maintenance, and disposition of property. The parties did not request the trial court issue findings of fact and conclusions of law. Wife now appeals.
Points on Appeal
Wife raises four points on appeal. In Point One, Wife contends that the trial court erred in awarding non-modifiable maintenance for a duration of thirty-six months because there is no substantial evidence in the record of an impending change in Wife's financial circumstances. Point Two charges the trial court with error in limiting the amount of Wife's maintenance to $2500 per month because, under Section 452.335.2,[1] that amount is unjust and insufficient. In Point Three, Wife alleges that the trial court erred in quashing the subpoena duces tecum on A-B, because the subpoena was reasonably calculated to lead to the discovery of documents directly relevant to the amount of Wife's maintenance award. Lastly, Wife claims in Point Four that the trial court erred by not dismissing Husband's claim for tortious interference with a business expectancy because Husband failed to prove damages.
Discussion
I. Points One and Two-The Maintenance Award
A. Standard of Review
In reviewing a judgment for dissolution, we will sustain the trial court's judgment unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously applies the law. Parciak v. Parciak, 553 S.W.3d 446, 452 (Mo. App. E.D. 2018) (citing Murphy v. Carron, 536 S.W.2d 30, 32 (Mo. banc 1976) ). "The trial court resolves matters such as the weight of evidence, the resolution of conflicting evidence, and witness credibility, and its rulings on these issues will not be reviewed by this Court." Sulkin v. Sulkin, 552 S.W.3d 793, 795 (Mo. App. E.D. 2018). The party challenging the divorce decree bears the burden of establishing that the trial court erred. Parciak, 553 S.W.3d at 452.
When awarding maintenance in a dissolution action, the trial court has broad discretion in determining the amount and duration of the maintenance. Sulkin, 552 S.W.3d at 795. Thus, we review the trial court's award of maintenance for an abuse of discretion. Parciak, 553 S.W.3d at 453. "A trial court abuses its discretion when its ruling is clearly against the logic of the circumstances then before it and is so arbitrary and unreasonable that it shocks one's sense of justice and indicates a lack of careful consideration." Sulkin, 552 S.W.3d at 796.
B. Analysis
Wife initially challenges the trial court's award of non-modifiable maintenance limited to thirty-six months. Specifically, Wife argues the record lacks substantial evidence of any impending change in Wife's financial circumstances to support a non-modifiable, limited judgment. Wife then focuses her claim of error on the amount of the maintenance award, and posits that monthly maintenance of $2500 is unjust and insufficient under Section 452.335.2. Because Points One and Two involve interrelated challenges to the maintenance award, we analyze them together below.
*649 Maintenance is appropriate when one spouse "(1) lacks sufficient property, including marital property apportioned to her, to provide for her reasonable needs; and (2) is unable to support herself through appropriate employment." Id. (citing Section 452.335.1). After determining that awarding maintenance is appropriate under the threshold requirements of Section 452.335.1, the trial court must consider the following ten statutory factors to determine the amount and duration of maintenance:
(1) The financial resources of the party seeking maintenance, including marital property apportioned to [her], and [her] ability to meet [her] needs independently, including the extent to which a provision for support of a child living with the party includes a sum for that party as custodian;
(2) The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment;
(3) The comparative earning capacity of each spouse;
(4) The standard of living established during the marriage;
(5) The obligations and assets, including the marital property apportioned to [her] and the separate property of each party;
(6) The duration of the marriage;
(7) The age, and the physical and emotional condition of the spouse seeking maintenance;
(8) The ability of the spouse from whom maintenance is sought to meet his needs while meeting those of the spouse seeking maintenance;
(9) The conduct of the parties during the marriage; and
(10) Any other relevant factors.
Section 452.335.2; see also In re Marriage of Shannon, 179 S.W.3d 920, 926 (Mo. App. S.D. 2005) (citing Section 452.335.2). "As an underlying principle, an award of maintenance is aimed at closing the gap between the income of the spouse who seeks maintenance and that spouse's monthly expenses." Sulkin, 552 S.W.3d at 796 (internal citations omitted).
Here, after considering the statutory factors for maintenance and the relevant facts and circumstances of the parties, the trial court determined maintenance was appropriate and awarded Wife non-modifiable maintenance of $2500 per month for thirty-six months.
1. Limited Duration and Non-modifiability
The trial court must base its award of maintenance on evidence from the parties' existing circumstances, not speculative, future conditions. Parciak, 553 S.W.3d at 453 (internal citation omitted) ("Placing a limitation on the duration of a maintenance award based on mere speculation or not supported by sufficient evidence that the parties' circumstances will be markedly different in the future constitutes an abuse of discretion."); see also Orange v. White, 502 S.W.3d 773, 778 (Mo. App. E.D. 2016) ; Keller v. Keller, 18 S.W.3d 589, 595 (Mo. App. W.D. 2000). While a trial court has broad discretion in awarding maintenance, the trial court does not have "unfettered discretion." Parciak, 553 S.W.3d at 453 ; Sulkin, 552 S.W.3d at 796. Rather, the trial court's implementation of a durational limit on a maintenance award "is warranted only where there is substantial evidence that the financial condition of the parties is subject to impending change," Underwood v. Underwood, 163 S.W.3d 490, 492 (Mo. App. E. D. 2005).
*650 Missouri law disfavors limited duration maintenance awards; conversely, a judicial preference exists for maintenance awards of unlimited duration. Parciak, 553 S.W.3d at 453 ; Underwood, 163 S.W.3d at 491-92.
The rationale provided by this Court in Parciak is applicable here. In Parciak, we reversed a maintenance award with a five-year limitation where the evidence was too speculative to show future events-the sale of the marital home and high school graduation of the youngest child-demonstrated an impending change in the wife's financial circumstances. 553 S.W.3d at 454-55. As a result, this Court found it improper to speculate further that wife, who held a law degree from Peru and was self-employed as a part-time photographer during the marriage, would be able to meet her reasonable expenses within the proscribed timeframe. Id. The Parciak holding followed an established line of cases finding that a trial court abuses its discretion when it prospectively limits the duration of a maintenance award based on improper speculation about the parties' future circumstances. See e.g., In re Marriage of McMillian, 399 S.W.3d 838, 841-42 (Mo. App. E.D. 2013) (reversing a thirty-six month maintenance limit where no substantial evidence showed the wife, a hair stylist and formerly successful salon owner, would be able to build a sufficient client-base to support herself within the allotted timeframe); Haynes v. Almuttar, 25 S.W.3d 667, 673 (Mo. App. W.D. 2000) (reversing a five-year maintenance limit where no substantial evidence showed a hospital would hire the wife, who maintained certification as a registered nurse, after an eighteen-year absence from the workforce); Keller, 18 S.W.3d at 595-96 (reversing an eighteen-month maintenance limit where no substantial evidence showed additional training would make the wife, who held a Master's in speech communication, fully self-supporting by the end of the maintenance period).
Here, Wife's current financial situation is that she has not held steady, full-time employment for more than twenty years and has maintained a limited solo practice that has generated little positive income for at least five years. The trial court's conclusion that Wife would be able to meet her reasonable needs within thirty-six months based upon a change of Wife's condition is entirely speculative. The evidence in the record relating to Wife's future ability to earn income was testimony by Wife and by Kaver, who interviewed Wife and prepared a report. From the evidence adduced at trial, Wife is licensed to practice law. During the marriage, Wife primarily devoted her time to raising the parties' two children as well as maintaining the Tahoma Drive Property, while Husband pursued his career with A-B. Missouri courts recognize that reentry into the workforce is impeded when individuals allow their careers to take second chair to their spouses in order to care for the children and the home. Greiner v. Greiner, 146 S.W.3d 442, 451 (Mo. App. W.D. 2004) ; see also Adelman v. Adelman, 878 S.W.2d 871, 874 (Mo. App. E.D. 1994) (recognizing maintenance was appropriate where the wife was the custodial parent for three children and was out of the job market for the past ten years).
The facts in the record poignantly forecast the challenges Wife will encounter as she seeks to resume a full-time legal practice. Wife graduated from Washington University School of Law in 1992. Wife has not been employed as an attorney outside of her limited solo-practice since the parties married in 1996. Missouri courts have consistently reversed durational limits on maintenance awards where the recipient spouses, albeit qualified with advanced degrees, lacked recent employment experience.
*651 See e.g., Haynes, 25 S.W.3d at 673-74 (reversing maintenance limit where the wife had not worked outside the home in eighteen years despite maintaining her certification as a registered nurse); In re Marriage of Goodding, 677 S.W.2d 332, 337 (Mo. App. W.D. 1984) (reversing maintenance limit where the wife's employment prospects were purely speculative despite wife having a degree and teaching certificate). We are persuaded that Wife's educational background alone does not support the trial court's award of maintenance for a limited duration, because an advanced degree does not guarantee an imminent change in circumstances. The record shows that Wife's only full-time work as an attorney came in her first position upon graduation from law school. Wife was employed full-time in private practice for only one year. Wife then worked part-time with a firm for one year before starting her solo part-time practice of family, traffic, and bankruptcy law in 1995. Wife initially worked approximately thirty hours per week, but the time devoted to her law practice significantly diminished as her family responsibilities increased. Since 2005, Wife has worked only intermittently, averaging only five to ten hours of legal work per week. The trial court imputed no income to Wife in its Form 14 and, according to the income records produced at trial, Wife had a loss of income in 2013, earned $204 in 2014, and had no reported income for 2015 and 2016.
Kaver testified that Wife could become employed full-time as an attorney with a small- to mid-sized law firm within two to six months and could earn between $70,785 and $107,910 annually. Kaver testified that his knowledge of the attorney marketplace in the St. Louis metropolitan region was based on his placement of approximately one attorney per year and on labor market statistics from Robert Half Legal. Kaver admitted that only one percent of his firm's annual work involves job placement for attorneys. The record shows that upon interviewing Wife, Kaver did not inquire about her professional networking or how many hours she had actually contributed to her part-time solo practice. Despite this lack of information, Kaver concluded that Wife's sporadic part-time work positioned her as an experienced attorney, better qualified for job openings than recent law school graduates. Contradicting his own conclusion, Kaver placed Wife's estimated salary range to be in the "inexperienced one-to-three year range" in the Robert Half Legal Salary Guide and testified her current skill set would earn her a lesser salary than someone who had been working full-time.
The apparent contradiction in Kaver's testimony lends support to our holding that the record lacks substantial evidence of a non-speculative impending change in Wife's current financial circumstance. Although accepting Kaver's report at face value, the deficiencies in the report leave the record before us without substantial evidence to overcome the judicial preference for unlimited, modifiable maintenance. Sweet v. Sweet, 154 S.W.3d 499, 509 (Mo. App. W.D. 2005) ("[A]lthough awards of non-modifiable decretal maintenance are permitted under [S]ection 452.335.3, there is a judicial preference for modifiable awards of maintenance of unlimited duration."). In particular, we note that the trial court appeared to rely solely on Kaver's report despite its noted deficiencies. Critically, the report lacks persuasiveness as it is speculative regarding Wife's job prospects and earning capacity, and it further lacked a specific plan for Wife being able to meet her reasonable expenses within thirty-six months. See Carter v. Carter, 901 S.W.2d 906, 909-10 (Mo. App. E.D. 1995) (reversing thirty-six month maintenance limit for lack of substantial *652 evidence where vocational expert testimony regarding the wife's employability, with and without completing her interior design degree, was too speculative to justify an impending change in her financial prospects within three years). "Maintenance awards cannot be based on mere speculation as to the future condition of the spouse." Id. This pillar of spousal maintenance awards cannot be undermined by testimony regarding potentially relevant, but uncertain future events. Therefore, even with the deference we accord to the trial court, the record lacks the substantial evidence required to support the limited maintenance award.
At the time of trial, Wife had no offers of employment and her immediate plans were uncertain. Wife remains the primary and full-time parent, chauffer, cook, nurse and caretaker of the children as Husband lives in New York. Wife testified that when she no longer has the responsibilities of the Tahoma Drive Property and her school-aged children-including the workday constraint of driving the children to and from their private schools-she could likely earn between $40,000 and $50,000, But see Parciak, 553 S.W.3d at 454-55 (deeming future events of the sale of the marital home and the impending high school graduation of the youngest child too speculative to allow for non-modifiable, limited duration maintenance); Underwood, 163 S.W.3d at 492 ("Wife's plans were indefinite at the time of trial, and any potential change in her financial circumstances therefrom would be based solely on speculation.") Although Kaver adopted the salary guide of Robert Half Legal and looked at multiple websites' job listings for attorneys in the St. Louis area, general job leads are not evidence of an individual's likelihood to be hired, nor are they equivalent to offers of employment for the purposes of removing speculation from the maintenance equation. See Walker v. Walker, 936 S.W.2d 244, 248 (Mo. App. S.D. 1996) (noting that job listings present relevancy issues absent testimony that the spouse actually meets the stated qualifications). Moreover, having a J.D. does not an attorney make. See Blumberg v. Blumberg, 561 So.2d 1187, 1189 (Fla. Dist. Ct. App. 1989) (finding in a case of spousal support that "possession of a law degree does not ensure self-sufficiency"); see also Laura W. Morgan, The Use of Vocational Experts in Support Cases, 30 J. AM. ACAD. MATRIMONIAL LAW , 351, 374 (2018) (noting that vocational experts typically overgeneralize, such as by not looking at all the qualifications for a successful attorney, which include education, experience, an ability to communicate with clients, and a host of other factors).
When a court reverses a durational limit on a maintenance award, it must also reverse the order making the maintenance non-modifiable. Parciak, 553 S.W.3d at 455 ; Burnett v. Burnett, 18 S.W.3d 27, 32-33 (Mo.App. W.D. 2000). "Just as an order terminating maintenance at a definite date in the future must be supported by substantial evidence of an impending change of circumstances, a maintenance order providing that it is non-modifiable must be justified by the facts and circumstances." Parciak, 553 S.W.3d at 453 (internal citation omitted). Because maintenance is inherently need-based and may extend only as long as the need exists, an award must be modifiable when that need depends on uncertain future events. Id. (citing Cates v. Cates, 819 S.W.2d 731, 735 (Mo. banc 1991) ); Sweet, 154 S.W.3d at 509. "Just as ... it is uncertain that [W]ife's financial situation will change in order to justify limiting the maintenance award ... it is also uncertain that future events might not also present reason for the maintenance to be modified."
*653 In re Marriage of Michel, 142 S.W.3d 912, 926 (Mo. App. S.D. 2004) (citing Burnett, 18 S.W.3d at 33 ). Ultimately, "[n]either an appellate court [n]or a trial court may speculate on what the future might justify; rather, such a determination should be made in a proceeding for modification of the award upon a showing of changed circumstances." Parciak, 553 S.W.3d at 453 (internal citations omitted).
The uncertainty in Wife's immediate financial future stems not only from her speculative and unsettled employment status but also from the sale of the Tahoma Drive Property, the net proceeds of which, if any, are to be divided forty percent to Husband and sixty percent to Wife, following satisfaction of the parties' 2016 tax debt. The record contains no evidence as to what money from the property sale will find its way to Wife. Any determination as to Wife's reasonable needs following the sale of the marital home is rank speculation. Id. ("Where future events which may be pertinent to the issues of maintenance are uncertain, such an award should be modifiable.").
We hold from the record before us that the trial court improperly speculated as to the future earning potential of Wife. Wife has not worked outside the home or produced any income for more than five years. Prior to that, Wife limited her professional career to working part-time in a solo practice, subordinating her legal career to her role as wife, mother, and caretaker of the household. We are not persuaded that a forty-eight year old attorney out of law school for more than twenty years, and who has worked only part-time on an intermittent and sporadic basis for more than ten years, has a reasonable opportunity to secure employment earning between $70,000 and $108,000 within any specified period of time. To the contrary, such conclusion seems exceedingly optimistic and speculative at best. When relevant events are uncertain to occur, maintenance should be modifiable. Underwood, 163 S.W.3d at 491-92 ; Sweet, 154 S.W.3d at 509. A modifiable award leaves Husband free to seek modification of the award if Wife becomes able to meet her reasonable expenses in the future. See Parciak, 553 S.W.3d at 455. Thus, the trial court abused its discretion in not designating the maintenance award as modifiable without a durational limit.
2. Amount
In Point Two, Wife challenges the amount of the maintenance award as insufficient and unjust. As discussed above, a trial court must consider the ten factors in Section 452.335.2 to determine the amount and duration of maintenance. Shannon, 179 S.W.3d at 926 (citing Section 452.335.2). The goal of spousal maintenance is to close the income gap between the spouse's income and the spouse's monthly expenditures. Sulkin, 552 S.W.3d at 796 (internal citation omitted). In setting the amount, a trial court need not "perform an exact mathematical calculation" and "may award a reasonable amount above the itemized expenses of the party seeking maintenance," so long as the amount does not merely lead to the accumulation of capital. Id. at 795.
In reviewing the amount of maintenance in this point on appeal, we must consider our reversal in Point One. Specifically, in cases involving multi-factored issues, such as the computation of spousal maintenance, "[t]he reversal of one portion of a dissolution decree may require the reversal of other portions of the decree, so that on remand, the trial court will reconsider all necessary related portions." Adelman, 878 S.W.2d at 875.
In this case, the trial court awarded Wife $2500 monthly non-modifiable maintenance *654 for thirty-six months. At trial, Wife presented evidence that her expenses totaled $38,518.50 per month. Although the trial court was not asked to make findings of fact regarding Wife's expenses, the trial court did find that the expense of maintaining the Tahoma Drive Property and its animals exceeded $30,000 per month and ordered the property to be sold as soon as practicable. The majority of the marital property awarded to Wife was comprised of the proceeds from the eventual sale of the Tahoma Drive Property, as well as retirement assets and stock. On its Form 14, the trial court imputed no income to Wife, who was unemployed at the time of trial, and imputed a monthly gross income of $42,215.00 to Husband.
Wife testified that after the Tahoma Drive Property is sold, she would likely be able to supplement her income to help meet her reasonable needs. However, "[a] spouse is not required to deplete or consume his or her portion of the marital assets before being entitled to maintenance." Schubert v. Schubert, 366 S.W.3d 55, 64 (Mo. App. E. D. 2012) ; Adelman, 878 S.W.2d at 874. While Wife acknowledged that the sale of the Tahoma Drive Property would reduce her expenses, the record lacks clarity on how much support Wife would need to supplement her income following that event.
We are acutely aware of the difference between the substantial sum of $38,518.50 Wife claimed as her monthly expenses as compared to the trial court's award of $2500 in monthly maintenance. Our discomfort with this discrepancy reflects the challenge in reviewing the maintenance amount without having before us the trial court's factual findings as to Wife's expenses. Although not in error-given that the onus is on the parties to request such findings-the absence of factual findings hampers our assessment of whether the expense-to-income gap has been adequately closed. See Neu v. Neu, 130 S.W.3d 723, 723 (Mo. App. E.D. 2004) (reversing the maintenance award where no adequate review was possible given the trial court's failure to make specific findings as to the wife's reasonable needs and expenses as requested by the husband). However, we also note that Wife petitioned for monthly maintenance in amount of $6000, and we use that sum as the base for our analysis of the reasonableness of the trial court's order of maintenance. We note that Husband's monthly income in excess of $42,000 suggests that Husband has the ability to meet his needs while also meeting the needs of Wife through maintenance. Yet in reviewing the amount of maintenance awarded to Wife, we must take into consideration those ongoing expenses claimed by Wife for which the trial court made Husband liable, including the monthly mortgage and utilities (approximately $6000) until Wife vacates the property and $2634 in monthly child support. Husband's obligations for these expenses sizably reduce Wife's claimed monthly expenses. Moreover, the record before us suggests both Husband and Wife are severely financially strained due to the equestrian-related expenses of the Tahoma Drive Property. However, even assessing all of the factors required in awarding maintenance, we question the reasonableness of the trial court's maintenance award given the record before us. See Parciak, 553 S.W.3d at 454-55 (finding that the future income gains from the anticipated sale of the marital home and the Husband's agreement to pay towards children's college would still not enable Wife to meet her expenses as denoted in the record).
Although an exact mathematical calculation is not required of the trial court, we are not persuaded that a monthly maintenance of $2500 is sufficient to cover Wife's *655 reasonable monthly expenses, even excluding the costs of caring for the Tahoma household and its horses, Husband's responsibility for property's mortgage and utilities, and child support. As detailed in Point One, the trial court erroneously concluded that the gap between Wife's income and those expenses not met by her monthly maintenance award would be closed quickly by Wife obtaining full-time employment in a high-paying attorney position. That presumption was based solely on the speculative and unspecific vocational expert testimony. See Parciak, 553 S.W.3d at 453 ; Shannon, 179 S.W.3d at 930-31. Because the trial court abused its discretion in awarding Wife non-modifiable maintenance limited to thirty-six months, we find it necessary to direct the trial court on remand to reevaluate the facts in light of the Section 452.335.2 factors in determining the amount of monthly maintenance needed to close the gap between Wife's income and her monthly expenses. See Sulkin, 552 S.W.3d at 798 ; Adelman, 878 S.W.2d at 875.
We reverse and remand to the trial court with instructions to enter an order for modifiable maintenance, without the thirty-six month limitation, and to review the amount of the monthly maintenance award in light of the evidence presented. Parciak, 553 S.W.3d at 455. Points One and Two granted.
II. Point Three-The Subpoena Duces Tecum
A. Standard of Review
We review a trial court's ruling on the admission of evidence for an abuse of discretion. Gray v. 3M Co., 494 S.W.3d 15, 17 (Mo. App. E.D. 2016). The trial court has broad discretion over discovery matters. Id. We presume the trial court's discovery ruling is correct and only find an abuse of discretion "when the trial court's ruling is clearly against the logic of the circumstances before the court at the time and is so unreasonable and arbitrary that it shocks one's sense of justice and indicates a lack of careful consideration." Id.
B. Analysis
In Point Three, Wife alleges that the trial court erred in quashing the subpoena duces tecum on A-B, because the subpoena was reasonably calculated to lead to the discovery of admissible evidence relating to Husband's conduct during the marriage, which conduct was relevant to the calculation of spousal maintenance.
The scope of discovery is limited to matters "reasonably calculated to lead to the discovery of admissible evidence." Rule 56.01(b)(1).[2] In a marriage dissolution case, admissible evidence includes facts relating to the conduct of the parties during the marriage. See Shannon, 179 S.W.3d at 926 (citing Section 452.335.2). While parties may issue a subpoena duces tecum for the production of documentary evidence, the law requires they "take reasonable steps to avoid imposing undue burden or expense on a non-party subject to the subpoena." Rule 57.09(b)-(c); State ex rel. Pooker ex rel. Pooker v. Kramer, 216 S.W.3d 670, 672 (Mo. banc 2007). A trial court may "[q]uash or modify the subpoena if it is unreasonable or oppressive[.]" Rule 57.09(b)(2). "The determination of reasonableness of the requirement to produce documents rests within the sound discretion of the trial court." Nichols v. Preferred Risk Grp., 44 S.W.3d 886, 895 (Mo. App. S.D. 2001) (internal citation omitted); In re T.E., 35 S.W.3d 497, 506 (Mo. App. E.D. 2001). "Further, experts or other persons from whom discovery is sought are *656 entitled to an order protecting them from 'annoyance, embarrassment, oppression, or undue burden or expense.' " Pooker, 216 S.W.3d at 672 (quoting Rule 56.01(c) ). The enumerated grounds for seeking protection under Rule 56.01(c) include "that a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way." Rule 56.01(c).
In this case, Wife issued a subpoena duces tecum to A-B seeking discovery for a period of over two years of all email correspondence between Husband and Gill, all of Gill's expense reports and corporate credit card receipts, and all documents showing Gill's flight and travel schedules. Wife argued this request was reasonably calculated to lead to the discovery of admissible evidence because such evidence was material to the issue of Husband's conduct during the marriage-specifically that Husband had an affair with Gill. Despite the possible connection between the discovery sought on Husband's conduct, we are not persuaded that the trial court's decision to quash the subpoena was "so unreasonable and arbitrary that it shocks one's sense of justice and indicates a lack of careful consideration." See Gray, 494 S.W.3d at 17.
Wife's subpoena was directed to a non-party (A-B) seeking personnel information about another non-party (Gill). When viewing the subpoena in light of the overall issues presented to the trial court, it was not erroneous for the trial court to conclude that Wife's requests were extremely broad and not reasonably calculated to lead to the discovery of admissible evidence. See State ex rel. Delmar Gardens N. Operating, LLC v. Gaertner, 239 S.W.3d 608, 612 (Mo. banc 2007) (finding "[t]he overbreadth of the pending discovery request is even more striking when one considers that [the employee] is not a party to the suit.") ''Missouri recognizes a right of privacy in personnel records that should not be lightly disregarded or dismissed." Id. at 611.
Furthermore, in addition to impacting the employment privacy rights of Gill, the Wife's subpoena impacted the confidentiality concerns of A-B, given that Husband and Gill were working together on a potential merger and acquisition. Confidential details about the A-B's acquisition fall within the scope of Rule 56.01(c)'s protection for "confidential research, development, or commercial information." Rule 56.01(c). See e.g., State ex rel. Blue Cross & Blue Shield of Mo. v. Anderson, 897 S.W.2d 167, 170 (Mo. App. S.D. 1995) (protecting privately negotiated pricing information between the party and a non-party). In this way, Wife's line of inquiry contrasts with dissolution cases in which trial courts properly ordered discovery of parties' own tax returns, even when a party works in a highly competitive industry in which income disclosure could damage the party's business. See, e.g., In re Marriage of Mangus, 227 S.W.3d 510, 513 (Mo. App. S.D. 2007). Here, the parties fully briefed the issues before the trial court, and we are not persuaded that Wife overcame the strong presumption that the trial court acted within its sound discretion in quashing Wife's subpoena. See Nichols, 44 S.W.3d at 895 ; In re T.E., 35 S.W.3d at 506. Point Three is denied.
III. Point Four-Tortious Interference
A. Standard of Review
In reviewing a judge-tried case, we will sustain the trial court's judgment "unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." Schubert, 366 S.W.3d at 62 (citing Murphy, 536 S.W.2d at 32 ).
*657 "We defer to the trial court's determinations of credibility and view the evidence and the inferences that may be drawn therefrom in the light most favorable to the judgment." Id.
B. Analysis
In Point Four, Wife claims that the trial court erred in failing to dismiss Husband's claim for tortious interference with a business expectancy because Husband failed to prove damages. We agree.
A plaintiff must prove five elements for a claim of tortious interference with a business relationship: "(1) the plaintiff was involved in a valid business relationship; (2) the defendant was aware of that relationship; (3) the defendant intentionally interfered with that relationship, inducing its termination; (4) the defendant acted without justification; and (5) the plaintiff suffered damages as a direct result of the defendant's conduct." Hibbs v. Berger, 430 S.W.3d 296, 318 (Mo. App. E.D. 2014). "The plaintiff carries the burden of proof and is required to proffer substantial evidence supporting each and every element; if the plaintiff fails to establish substantial evidence of any one element, the plaintiff's claim for tortious interference fails." Id. Thus, a claim for tortious interference cannot prevail unless the plaintiff satisfies the element of showing he was damaged as a direct result of the interference. AIG Agency, Inc., v. Missouri Gen. Ins. Agency, Inc., 474 S.W.3d 222, 230 (Mo. App. E. D. 2015).
Here, the trial court acknowledged in its judgment that, even assuming the truth of Husband's allegations, Wife did not cause Husband to lose his employment, and further found Husband suffered no damage as a result of Wife's conduct. Given that the trial court expressly found Husband incurred no damages, Husband's claim for tortious interference must fail, and the trial court was obliged to deny the claim. AIG, 474 S.W.3d at 230. The trial court's failure to dismiss the tortious interference claim was against the weight of the evidence. See Schubert, 366 S.W.3d at 62.[3] Therefore, we reverse and enter judgment dismissing with prejudice Husband's Count II for tortious interference in the Amended Petition for Dissolution.
Conclusion
The judgment of the trial court is affirmed in part and reversed and remanded in part.
Gary M. Gaertner, Jr., J., concurs.
Colleen Dolan, J., concurs.

All statutory references are to RSMo (2016) unless otherwise indicated.

All rule references are to Mo. R. Civ. P. (2016) unless otherwise indicated.

Although Husband alleges he moved to voluntarily dismiss the tortious interference claim, he moved to dismiss a temporary restraining order, which had no effect on the substantive tort claim.